**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**MIDDLE DIVISION**

FILED

98 MAR 20 PM 2:35

U.S. DISTRICT COURT
N.D. OF ALABAMA

|  |  |
|---|---|
| BETTY LORINE GREFFEY,<br>as Administratrix of the<br>Estate of James Edward<br>Morrison,<br><br>    Plaintiff,<br><br>vs.<br><br>STATE OF ALABAMA DEPARTMENT<br>OF CORRECTIONS, DR. DAVID<br>SANDEFER, JULIAN VARNER,<br>KIMBRELL THOMSON, ELEANOR<br>COACHMAN,<br><br>    Defendants. | Civil Action No. CV-97-S-169-M |

**ENTERED**

**MAR 2 0 1998**

### MEMORANDUM OPINION

This is a prison suicide case. Plaintiff asserts claims against all defendants based on 42 U.S.C. § 1983, and, Alabama Code § 6-5-410.[1] The action presently is before the court on motions for summary judgment filed by all defendants.[2] Upon consideration of the pleadings, briefs, and evidentiary submissions, this court concludes the motions are due to be granted with regard to plaintiff's federal claims, but denied as to her state law wrongful death claim.

### I.  SUMMARY OF FACTS

James Edward Morrison was convicted of murder in Franklin County Circuit Court on April 17, 1991. He was sentenced to life in prison. (Plaintiff's Exhibit 13 at 5, 9.) The conviction and

---

[1] Ala. Code § 6-5-410 is that state's wrongful death statute: see note 17 *infra.*

[2] Defendant Dr. David Sandefer also filed a motion to compel. This court does not reach that motion.

sentence were affirmed by the Alabama Court of Criminal Appeals on March 27, 1992.  The Alabama Supreme Court denied *certiorari* on July 24, 1992.  (*Id.; see also Morrison v. State of Alabama*, 601 So. 2d 165 (Ala. 1992).)

## A.   Morrison's Suicide Attempt

Morrison slashed his left wrist with a razor blade on February 3, 1993, while being transported from the Franklin County Jail to Kilby Correctional Facility.  (Dennis Deposition at 10-11.)  The incident was described as an "attempted suicide"[3] in a contemporaneous "Institutional Incident Report" completed by Kilby correctional officer Ulysses Roberts.  (*Id.*, Exhibit 3-B at 1.) Lieutenant Ricky Dennis, first shift supervisor on duty at Kilby on the date of Morrison's arrival, also recorded the injury as an "attempted suicide" on the evidence form he attached to the razor blade.  (*Id.*, Exhibit 3-B at 2; *see also* Dennis Deposition at 8, 12, 14-15.)

## B.   Morrison's Psychological Evaluations

### 1.   Kilby Correctional Facility

Lieutenant Dennis completed a "Mental Health Service Referral Form" in accordance with Kilby's standard operating procedures, for the purpose of having Morrison evaluated by a mental health

---

[3] This conclusion is disputed.  Defendants claim that Morrison slashed his wrist because the "officers were treating him poorly."  (Defendants' Exhibit 2, "Psychological Interview" dated February 4, 1993.)  Nevertheless, the court considers the evidence in the light most favorable to plaintiff, as it must.  *See* Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct.  1598, 1608, 26 L. Ed. 2d 142 (1970)  Even so, what the court states as facts in this opinion "may not be the actual facts.  They are, however, the facts for present purposes." Montoute v. Carr, 114 F.3d 181, 182 (11th Cir. 1997) (*quoting* Swint v. City of Wadley, 51 F.3d 988, 992 (11th Cir. 1995)).

2

professional. (Dennis Deposition at 16-19.)

Morrison's first evaluation occurred on February 4, 1993. It was conducted by Dr. Katherine S. Jones, a clinical psychologist/counselor.[4] Her report reflects that Morrison then "[d]enie[d] suicidal ideation or intent past and present. Says he cut wrist yesterday because officers were treating him poorly." (*Id.*, Exhibit 4 at 1.)

Later that same day, Morrison also was evaluated by a Dr. Mahammod,[5] whose report reflects the following:

> Referred after cut ... wrist en route to Kilby after "angry at the driver." Blames others for all his problems. Claims innocence [and has] "Proof back at the Co[unty] Jail in my papers." Non-suicidal, non-homicidal at interview, ... not depressed. Likely anti-social personality. S/P suicidal behavior. Recommend NO MEDS ... therapy, group therapy. [Followup in] 1 week.

(Plaintiff's Exhibit 11 at 22.) Dr. Mahammod referred Morrison to Dr. Jane Faile, a licensed psychologist, for further evaluation.

Prior to Dr. Faile's evaluation, however, Dr. W. B. Brantley conducted a psychological interview with Morrison on February 9, 1993. (*Id.* at 19-21.) Under the heading "Recommendations/Remarks," he wrote: "1st time felony offender. No real problems anticipated. Recommend SAP/JBE/Trade at Draper or appropriate...."[6]

---

[4] Jones was not employed by the Department of Corrections, but by "Quest Care," a private entity which contracted with the department in 1993 to provide medical services to inmates. (Dennis Deposition at 20-21.) Dr. David Sandefer, a clinical psychologist, is the only mental health professional employed by the Department of Corrections who evaluated Morrison during his incarceration. (*See* Sandefer Deposition at 53-55.) All other mental health professionals who met with Morrison were employed by private firms which contracted for such care.

[5] Neither the doctor's full name, nor the precise spelling of his last name, is discernable from the record.

[6] From the present record, the court cannot discern the last word in Dr. Brantley's notation, or an explanation of the term "SAP/JBE/Trade."

3

(*Id.* at 21.)

Dr. Jane Faile met Morrison on February 18, 1993, and recorded that he had "[r]ecovered from depression in County Jail," and that "[h]e will request sessions if needed." (Dennis Deposition, Exhibit 4 at 4.)

Morrison also was subjected to an "Initial Inmate Classification" evaluation on the same date he was seen by Dr. Jane Faile (February 18, 1993), as part of the standard processing of inmates at Kilby. (Complaint ¶ 11.) Upon entering the Alabama prison system, inmates are classified according to the security risk they pose, and then assigned to appropriate prison facilities based on that classification. (Whaley Deposition at 22-23.) The more restricted and secure facilities have higher numbers; the less secure facilities have lower numbers. (*Id.* at 23.)

Although Morrison's risk assessment score indicated he should be classified as a high security risk (Level VI), he instead was initially classified at a lower level (Level IV). (Complaint ¶ 12; Whaley Deposition at 24.) That decision was made by Kilby's classification coordinator, Annette Coleman. (Whaley Deposition at 19.) Her determination was overruled, however. Paul Whaley, director of classification for the Department of Corrections, changed Morrison's classification to the highest level (Level VI) on February 23, 1993, based "upon the nature of the crime and his risk assessment." (*Id.* at 7, 16, 24, 26-27.)

A document entitled "In-Patient Medical Record, Progress

4

Notes," apparently reflects another evaluation of Morrison on February 26, 1993:   "Needs counseling about anxiety induced nightmares occasioned by his impending transfer to Draper (where he feels he will be compromised or threatened.)   Referred for counselling."[7]   (Plaintiff's Exhibit 11 at 9 (emphasis supplied).)

## 2.   St. Clair Correctional Facility

Morrison was not transferred to Draper as he feared, but instead to the St. Clair Correctional Facility, a Level VI institution, on March 2, 1993. (Thomson Deposition at 13-14.)   He was interviewed by classification specialist (and defendant) Kimbrell Thomson upon arrival.   (Id. at 13.)   Thomson reviewed Morrison's institutional file and noticed the incident report about his February 3rd attempted suicide.   That prompted him to "hand-carry" Morrison's file to another defendant herein, Dr. David Sandefer, to ensure that Morrison was promptly evaluated for "suicidal tendenc[ies]."   (Id. at 23-25.)

Dr. Sandefer was St. Clair's resident clinical psychologist. He immediately evaluated Morrison.   Following their session, Sandefer recorded in his conference notes that Morrison related two prior suicide attempts by "multiple methods."[8]   (Sandefer Deposition at 16, 50-51.)   Morrison emphatically denied he then

---

[7] This report is signed, but the court cannot read the signature.   Dr. Sandefer opined that it may be the signature of a Dr. Kalla, who was formerly employed at Kilby.   (Sandefer Deposition at 83.)

[8] Although Morrison claimed during his meeting with Dr. Sandefer to have attempted suicide on a prior occasion by drug overdose, no details of such an event appeared in his record at the time Dr. Sandefer reviewed the file (Sandefer Deposition at 50), nor are such details included in the record now before the court.   Dr. Sandefer also testified that he believed Morrison would be able to obtain razor blades and illicit drugs in prison to enable a third such attempt. (Id. at 51.)

5

entertained suicidal thoughts, however, and promised to alert Sandefer if any subsequently occurred. (*Id.* at 52.) Dr. Sandefer nevertheless concluded that Morrison presented a risk of suicide that was "higher than the average inmate." (*Id.*) Even so, Sandefer did not place Morrison on suicide watch,[9] because he "adamantly said he was not suicidal and didn't have any thoughts about it." (*Id.* at 51-52.) Instead, Dr. Sandefer referred Morrison to Dr. Todd Walborn (a psychiatrist employed by the private firm then providing mental health services to inmates incarcerated in the St. Clair Correctional Facility) for "a mental status exam, treatment plan, counselling." (*Id.* at 52.) On the referral form, dated March 2, 1993, Dr. Sandefer recorded: "Two suicide attempts (cut wrist with razor blade & overdose of illicit drugs) on Feb. 3, 1993."[10] (Dennis Deposition, Exhibit 4 at 8.)

Before the Walborn evaluation, however, Kimbrell Thomson — the classification specialist who had interviewed Morrison upon his arrival at St. Clair Correctional Facility — received the following hand-written note from Morrison on March 24, 1993:

> I James Morrison respectfully come before you now to ask for your help.
>
> My life is in danger from other inmates [who are] trying to corner me and get me to have sex with them and I don't believe in that stuff.
>
> They told me that if I said anything to anyone about this that they would kill me. They said it did not

---

[9] A suicide watch entails the following: "we take all their belongings and store them, and take them to the infirmary and place them in an observation cell there." (Varner Deposition at 13.) Such inmates are visually observed by an officer every 15 minutes. (*Id.*)

[10] See note 8 *supra.*

6

matter where I was in camp [because] if they could not
get to me ... they would have someone get to me and kill
me.

    I ask that you please talk to me as soon as possible
please.

(Plaintiff's Exhibit 12.)   Thomson responded to Morrison's plea by
recommending that he be immediately removed from the general
population[11] and placed in administrative segregation.   (Thomson
Deposition at 30.)   "Administrative segregation" consists of
confinement to a one-man cell.   (Varner Deposition at 8.)
Defendant Eleanor Coachman, classification supervisor at St. Clair
and Thomson's superior, reviewed Thompson's recommendation, along
with Dr. Sandefer and the last individual defendant named in this
action, Julian Varner.   All three prison officials concurred with
Thomson's recommendation to segregate Morrison from the facility's
general population.   (Coachman Deposition at 40-42.)

    Defendant Julian Varner supervises the administrative
segregation unit to which Morrison ultimately was transferred.[12]
(Varner Deposition at 11.)   Varner testified that he is trained in
detecting suicidal potential in inmates, the primary signs of which
are "depression and withdrawal."   (Id. at 20-21.)   Varner
acknowledged that a prior suicide attempt would be a factor to take
into account when deciding whether a particular inmate presented a
significant suicide risk, but added that such fact would not,

---

[11] The classification evaluation conducted at Kilby recommended that
Morrison be placed in St. Clair's general population.   (Thomson Deposition at 28-
29.)

[12] All segregation cells at St. Clair apparently were occupied on the date
of Thomson's recommendation, because Morrison initially was placed in the health
care unit.   (Sandefer Deposition at 85.)

7

alone, be sufficient reason to place an inmate on suicide watch.[13] (*Id.* at 21.) However, Varner was not then aware that Morrison had cut his left wrist on February 3rd. (*Id.*)

Dr. Walborn's notes[14] reflect that he saw Morrison on two occasions during March: "Patient seen on 3/25/93 and 3/26/93. No suicidal ideation present. Being monitored in HCU for protective custody. Fears being raped by other inmates." (Dennis Deposition, Exhibit 4 at 8.) Under the heading "Disposition," Dr. Walborn wrote: "Monitor for recurring suicidal ideation."[15] (*Id.*) Morrison met with Dr. Walborn twice more the following week: on April 1 and April 2, 1993. (Plaintiff's Exhibit 11 at 7.) Dr. Walborn's notes from those conferences reflect that Morrison then had "no suicidal/homicidal ideations." (*Id.*)

Another doctor (apparently a Dr. Blankenship[16]) also met with Morrison on March 25, and April 1, 1993. Notes from the first of those meetings reflect that Morrison's energy and mood were low. (*Id.* at 8.) The second notation, dated April 1st, states: "Much improved appetite. Mood improving. ... No prior suicidal ideation. Well org[anized]. ... No [suicidal-homicidal] fantasies." (*Id.* at

---

[13] See note 9 *supra*.

[14] This referral form is not signed. Dr. Sandefer testified that he referred Morrison to Dr. Walborn, and that the handwriting was Dr. Walborn's. (Sandefer Deposition at 52, 86.) Thus, even if the notes were not, in fact, written by Dr. Walborn, they were the result of Dr. Sandefer's referral to the contract psychiatrist at St. Clair Correctional Facility.

[15] The note dated March 26 states: "Starts medication tonight." (Plaintiff's Exhibit 11 at 8.) The court is unable to determine precisely what medication was prescribed for Morrison, or for what purpose. Subsequent notes suggest that the medication may have been prescribed to increase Morrison's appetite. (*See id.* at 7.)

[16] The doctor's signature cannot be deciphered by the court. Dr. Sandefer apparently understood the notes as those of a Dr. Blankenship. (Sandefer Deposition at 73-74.)

8

7.)

Morrison was reclassified to Security Level V on April 6, 1993, and was recommended for transfer to Holman prison. (Plaintiff's Exhibit 13 at 33.)

That transfer never took place.

At 6:07 a.m. on the morning of April 11, 1993, security personnel noticed that Morrison had not picked up the breakfast tray that had been delivered to his cell shortly before 6:00 a.m. (*Id.* at 34.)  Officers could get no response from him.  (*Id.*)  Upon entering the cell, they found Morrison "seated on the floor ... [with] a thin strip of bed sheet tied firmly around his neck with the other end tied to the steel mesh cover of the bed light."  (*Id.* at 35.)  Morrison was immediately taken to the prison infirmary, but he could not be revived.   (*Id.*)   The on-call physician estimated that Morrison had been dead approximately one hour when he was discovered.   (*Id.*)

## C.   Plaintiff's Claims

This action originally was filed on October 3, 1994, in the Circuit Court of Montgomery County, Alabama.  That complaint was amended on July 9, 1996, to add the four individual defendants. Those defendants removed the case to the United States District Court for the Middle District of Alabama on July 18, 1996.  The action was transferred to this court on January 22, 1997.

Plaintiff's amended complaint contains two counts.  The first alleges a claim for wrongful death arising under Alabama Code § 6-

9

5-410.[17]

    23.    The defendants, acting in their individual and
            official capacities, through their acts and
            failures to act, caused the death of James Edward
            Morrison.

    24.    The death of James Edward Morrison was the direct
            result of the knowing and [sic] denial of adequate
            supervision and protection of Mr. Morrison
            resulting in plaintiff's decedent's wrongful death
            under Ala. Code § 6-5-410 (1975).

(First Amended Complaint ¶¶ 23-24.)   Plaintiff asserts her sole

federal claim in Count Two:

> The defendants, acting individually and in their official
> capacities, and under color of law, caused the wrongful
> death of the decedent by acting with deliberate
> indifference to the decedent's propensity for suicide,
> and by failing or refusing to provide him with reasonable
> protection from harm, thereby depriving the decedent of
> his rights, privileges and immunities as guaranteed by
> the Constitution and laws of the United States under 42
> U.S.C. § 1983, et seq.

(Id. ¶ 27.)

## II.   DISCUSSION

    Section 1983 provides a civil action against any person who,

while acting under color of state law, subjects any citizen to the

deprivation of rights, privileges, or immunities secured by the

---

[17] Alabama Code § 6-5-410(a) provides:

    A personal representative may commence an action and recover such
    damages as the jury may assess in a court of competent jurisdiction
    within the State of Alabama, ... for the wrongful act, omission, or
    negligence of any person, persons, or corporation, his or their
    servants or agents, whereby the death of his testator or intestate
    was caused, provided the testator or intestate could have commenced
    an action for such wrongful act, omission, or negligence if it had
    not caused death.

Constitution or laws of the United States.[18]

> A person "subjects" another to the deprivation of a
> constitutional right, within the meaning of § 1983, if he
> does an affirmative act, participates in another's
> affirmative act, or omits to perform an act which he is
> legally required to do that causes the deprivation of
> which complaint is made.

*Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978). The statute
is designed "to deter state actors from using the badge of their
authority to deprive individuals of their federally guaranteed
rights and to provide relief to victims if such deterrence fails."
*Wyatt v. Cole*, 504 U.S. 158, 161, 112 S.Ct. 1827, 1830, 118 L.Ed.2d
504 (1992). The body of case law that has grown from § 1983's
fertile, statutory soil is, as one commentator aptly described it,
"dense, complex, and often subtle." 2 Rodney A. Smolla, *Federal
Civil Rights Acts* § 14.01[4][d], at 14-13 (3d ed. 1997).

## A.   The Elements of a § 1983 Claim

The primary issues to be addressed in actions based upon the
statute are these: are defendants "persons" within the meaning of
that statutory term; were defendants acting "under color of" state
law at the time of the events complained of; what were the
constitutional rights, privileges, or immunities of which
plaintiff's decedent allegedly was deprived; and, was there in fact

---

[18] 42 U.S.C. § 1983 provides in part that:

> Every person who, under color of any statute, ordinance, regulation,
> custom, or usage, of any State or Territory or the District of
> Columbia, subjects, or causes to be subjected, any citizen of the
> United States or other person within the jurisdiction thereof to the
> deprivation of any rights, privileges, or immunities secured by the
> Constitution and laws, shall be liable to the party injured in an
> action at law, suit in equity or other proper proceeding for
> redress.  ...

11

and under law a constitutional deprivation? *See, e.g., Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 1913, 68 L.Ed.2d 420 (1981), *overruled on other grounds, Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986); *see also Burch v. Apalachee Community Mental Health Services, Inc.*, 840 F.2d 797, 800 (11th Cir. 1988), *aff'd sub nom. Zinermon v. Burch*, 494 U.S. 113, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990). Additionally, even though it rarely is mentioned in reported decisions, "causation is an essential element of a section 1983 cause of action." *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir. 1986).[19] Finally, a plaintiff must prove his or her damages, or basis for entitlement to equitable relief. Monetary damages are governed by the same basic principles that prevail in tort law generally, and normally will be satisfied by showing that a defendant's conduct caused some actual harm.

In sum, there are six elements to a *prima facie* § 1983 case. A plaintiff must show (1) that a "person" (2) acting "under color of" some state law, custom, or practice (3) subjected plaintiff's decedent (4) to the deprivation of rights, privileges, or immunities secured by the "Constitution and laws" of the United States, and (5) that such conduct was the proximate cause of (6)

---

[19] Causation — both causation in fact and proximate causation — is an essential element of a § 1983 claim. *See, e.g.*, Reimer v. Smith, 663 F.2d 1316, 1322 & n.4 (5th Cir. 1981)(it is axiomatic that a plaintiff cannot succeed in a § 1983 action if he or she fails to demonstrate a causal connection between the state official's alleged wrongful act and the alleged deprivation). *See generally*, Randall R. Rader, *Section 1983, The Civil Rights Action: Legislative and Judicial Directions*, 15 CUMB. L. REV. 571, 601-607 (1985), providing a useful discussion of the causation element in a § 1983 action.

12

plaintiff's damages or basis for equitable relief.   A proper analysis of § 1983 claims generally requires that each element be addressed.

**B.   Are Defendants "Persons" Subject to Suit Under § 1983?**

A determination of whether each defendant is considered a "person" subject to suit under § 1983 requires separate discussion.

**1.   Alabama Department of Corrections**

A state is not considered a "person" subject to suit for money damages under § 1983.   *Will v. Michigan Department of State Police*, 491 U.S. 58, 71, 109 S.Ct. 2304, 2312, 105 L.Ed.2d 45 (1989) ("neither a state nor its officials acting in their official capacities are 'persons' under § 1983").[20]   A suit against a state

---

[20] Technically, the Court's decision in Will v. Michigan Dep't of State Police, 491 U.S. 58, 71, 109 S.Ct. 2304, 2312, 105 L.Ed.2d 45 (1989), is not bottomed upon the Eleventh Amendment.   Instead, the Court looked to that Amendment "as a relevant consideration.   The primary focus of *Will* was, as it should have been, on the language and history of § 1983."   Hilton v. South Carolina Pub. Ry. Comm'n, 502 U.S. 197, 205, 112 S.Ct. 560, 571, 116 L.Ed.2d 560 (1991); *see also id.* ("Will did not import the entirety of our Eleventh Amendment jurisprudence into the area of statutory construction").

Even so, the Court in *Will* clearly was "strongly influenced by Eleventh Amendment considerations."   2 Rodney A. Smolla, *Federal Civil Rights Acts* § 14.03[2] (3d ed. 1997).

> Given the fact that states traditionally enjoy Eleventh Amendment immunity, the Court held, "if Congress intends to alter the 'usual constitutional balance between the States and the Federal Government,' it must make its intention to do so 'unmistakably clear in the language of the statute.'"

*Id.* (quoting Will, 491 U.S. at 65, 109 S.Ct. at 2309); *see also Will*, 491 U.S. at 66, 109 S.Ct. at 2310 ("Congress, in passing § 1983, had no intention to disturb the States' Eleventh Amendment immunity and so to alter the federal-state balance in that respect").

In addition to its discussion of the Eleventh Amendment's impact upon the scope of § 1983, the *Will* Court found that

> Congress did not intend to override well-established immunities or defenses under the common law.   ...   The doctrine of sovereign immunity was a familiar doctrine at common law.   The principle is elementary that a State cannot be sued in its own courts without its consent.   ...   We cannot conclude that § 1983 was intended to disregard the well-established immunity of a State from being sued without its consent.

13

department "is no different from a suit against the State itself."
*Id.* Accordingly, plaintiff's § 1983 claim against the Alabama
Department of Corrections is due to be dismissed.

   **2.  Defendants Sandefer, Varner, Thomson, and Coachman**

      **a.  Official capacity claims**

   State officials also are not considered "persons" subject to
suit for money damages under § 1983, when sued in their <u>official
capacities</u>. Again, the Supreme Court's decision in *Will* directs
that result. The Court recognizes that suits against an individual
acting in his or her official capacity impose liability on <u>the
governmental entity</u> the official represents.

> Obviously, state officials literally are persons. But a
> suit against a state official <u>in his or her official
> capacity</u> is <u>not</u> a suit against the <u>official</u> but rather is
> a suit against the official's <u>office</u>.  ...  As such, it
> is no different from a suit against the State itself.

*Will*, 491 U.S. at 71, 109 S.Ct. at 2312 (emphasis supplied). *See
also, e.g.*, *Brandon v. Holt*, 469 U.S. 464, 471-72, 105 S.Ct. 873,
877-78, 83 L.Ed.2d 878 (1985).

   Thus, plaintiff's claims for money damages against defendants
Sandefer, Varner, Thomson, and Coachman in their official
capacities are functionally equivalent to claims against the entity
each represents:  the State of Alabama's Department of Corrections.

---

      The legislative history of § 1983 does not suggest a different
   conclusion.   ...   Construing § 1983 as a remedy for official
   violation of federally protected rights does no more than confirm
   that the section is directed against state action — action under
   color of state law. *It does not suggest that the State itself was
   a person that Congress intended to be subject to liability.*

*Will*, 491 U.S. at 67-68, 109 S.Ct. at 2310-11 (emphasis supplied)(citations and
internal quotation marks omitted).

14

*See Monell v. Department of Social Services*, 436 U.S. 658, 690 n.55, 98 S.Ct. 2018, 1036 n.55, 56 L.Ed.2d 611 (1978)(suits against officials in their official capacities "generally represent only another way of pleading an action against an entity of which an official is an agent").

> [A] cause of action for money damages cannot be brought under § 1983 against an official in his or her official capacity as the representative of a state or a state agency, since no cause of action could be brought directly against the state or state agency under the principles declared in *Will*.

2 Smolla, *supra* § 14.03[4][a], at 14-22 (footnote omitted). It accordingly follows that plaintiff's claims for money damages against those defendants in their official capacities are due to be dismissed.

### b. Individual capacity claims

On the other hand, suits against state officials in their individual capacities are claims against the officials themselves: relief is sought from the person, not the governmental entity he or she represents. *See, e.g., Hafer v. Melo*, 502 U.S. 21, 25, 112 S.Ct. 358, 362, 116 L.Ed.2d 301 (1991); *Colvin v. McDougall*, 62 F.3d 1316 (11th Cir. 1995). Accordingly, defendants Sandefer, Varner, Thomson, and Coachman are "persons" for purposes of § 1983, when sued in their individual capacities. *Hafer*, 502 U.S. at 31, 112 S.Ct. at 365 ("state officials, sued in their individual capacities, are 'persons' within the meaning of § 1983").

> The *Will* doctrine does not apply to such officials, who are indeed considered persons for purposes of § 1983. That such an official acts under color of law does not

15

> mean that he or she becomes the state—when sued in his
> or her individual capacity, he or she is a person for the
> purpose of § 1983, and enjoys no Eleventh Amendment
> immunity.   Such officials may, of course, enjoy other
> absolute or qualified immunities established under § 1983
> for suits against officials.

2 Smolla, *supra* § 14.03[4][b].

## C.   **Were Defendants Acting "Under Color of" State Law?**

The second element of a *prima facie* case provokes this inquiry:   were the individual defendants acting "under color of" some law, custom, or practice when each engaged in the conduct complained of?

Varner, Thomson, and Coachman unquestionably were acting under color of state law when performing their assigned duties at the St. Clair Correctional Facility pursuant to authority vested in them by Alabama statutes.   "[A] public employee acts under color of state law ... while exercising his responsibilities pursuant to state law." *West v. Atkins*, 487 U.S. 42, 50, 108 S.Ct. 2250, 2255, 101 L.Ed.2d 40 (1988)(citations omitted); *see also Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 936 n.18, 102 S.Ct. 2744, 2752-53 n.18, 73 L.Ed.2d 482 (1982)("state employment is generally sufficient to render the defendant a state actor").

State action also is present in the actions of Dr. Sandefer. Alabama has a constitutional obligation to provide adequate medical and mental health care to inmates housed in its penal facilities. *See West,* 487 U.S. at 54, 108 S.Ct. at 2258.   To satisfy that obligation, the Department of Corrections refers inmates in need of mental health services to psychological and psychiatric

16

professionals, either on staff or under contract with the State to
provide such services on behalf of the Department. Dr. Sandefer is
one of the staff psychologists employed by the State to whom
inmates housed at St. Clair Correctional Facility were directed
during the relevant timeframe. Thus, when he undertook to conduct
a mental health evaluation of Morrison, he was acting "under color
of" state law for purposes of § 1983. *See, e.g., West*, 487 U.S. at
50, 108 S.Ct. at 2255; *Conner v. Donnelly*, 42 F.3d 220, 225 (4th
Cir. 1994)("any physician authorized by the state to provide
medical care to a prisoner exercises power that is traditionally
the exclusive prerogative of the state").

**D.    Delineation of the Rights, Privileges, or Immunities of Which
Plaintiff's Decedent Allegedly was Deprived**

Plaintiff asserts deprivation of rights secured to her
decedent by the Fourteenth Amendment.

> 27.    The defendants, acting individually and in their
> official capacities, and under color of law, caused
> the wrongful death of the decedent by acting with
> deliberate    indifference    to    the    decedent's
> propensity for suicide, and by failing or refusing
> to provide him with reasonable protection from
> harm, thereby depriving the decedent of his rights,
> privileges and immunities as guaranteed by the
> Constitution and laws of the United States under 42
> U.S.C. § 1983 *et. seq.*

> 28.    The defendants' acts and refusals to act were so
> contrary    to    all    standards    of    humanity    and
> constitutional    government    by    law    that    the
> plaintiff's decedent was deprived of his rights
> guaranteed by the Fourteenth Amendment of the
> United States Constitution.

(First Amended Complaint ¶¶ 27-28 (emphasis supplied).)    That is
not precisely correct, however.    The gravamen of her constitutional

17

claim is: defendants subjected her decedent "to cruel and unusual punishment in violation of the Eighth Amendment,[21] made applicable to the States by the Fourteenth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 101, 97 S.Ct. 285, 289, 50 L.Ed.2d 251 (1976).

> [D]eliberate indifference to serious medical needs of prisoners constitutes the "unnecessary and wanton infliction of pain" ... proscribed by the Eighth Amendment. This is true whether the indifference is manifested by prison doctors in their response to prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed. Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983.

*Estelle,* 429 U.S. at 104-05, 97 S.Ct. at 291.

## E.   Was There a Constitutional Deprivation?

The Supreme Court's opinion in *Estelle* suggests three questions which must be addressed to determine whether a prisoner's death by suicide implicates the Eighth Amendment: (1) did the deceased have a "serious medical need"; (2) were defendants aware of that need; and (3) were defendants "deliberately indifferent" to that known need?   Plaintiff can establish a constitutional deprivation only if each question is answered in the affirmative as to each defendant.

The actions of the prison-officer defendants (Julian Varner, Eleanor Coachman, and Kimbrell Thomson) will be examined under *Estelle's* three-prong, "deliberate indifference to serious medical needs" analysis.

---

[21] The Eighth Amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

18

That same analysis could be applied to the actions of healthcare providers who render treatment to prison inmates, such as staff psychologist David Sandefer. *See Ancata v. Prison Health Services, Inc.*, 769 F.2d 700 (11th Cir. 1985). Grossly incompetent or inadequate health care can rise to the level of a constitutional violation. *See Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir. 1986)(medical treatment that is "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness" constitutes deliberate indifference). A doctor's decision to take an easier and less efficacious course of treatment can amount to deliberate indifference. *Id.* Failure to respond to a known medical problem also can constitute deliberate indifference. *Ancata,* 769 F.2d at 704.

On the other hand, mere professional negligence (or breach of the applicable standard of care) does not constitute deliberate indifference. "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle,* 429 U.S. at 106, 97 S.Ct. at 292 (1976). In like manner, a simple difference in professional opinion does not rise to the level of constitutional scrutiny. *See Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977)("we disavow any attempt to second-guess the propriety or adequacy of a particularized course of treatment. Along with all other aspects of health care, this remains a question of sound professional judgment").

19

The primary distinction between the deliberate indifference test discussed here, and the qualified immunity analysis addressed hereafter, is this: the test for deliberate indifference involves a subjective component, while qualified immunity scrutiny invokes only an objective reasonableness inquiry. *See Harris v. Coweta County*, 21 F.3d 388, 394 (11th Cir. 1994)("the subjective component of deliberate indifference ... is a question for the finder of fact that is not resolved through the objective reasonableness inquiry of qualified immunity")(citations omitted).[22]

The Eleventh Circuit recognizes that an examination of the knowledge and actions of medical and mental health professionals is not particularly suited to evaluation through the subjective lens of the deliberate indifference test, because "the quality of a doctor's treatment is evaluated according to professional standards." *Waldrop v. Evans*, 871 F.2d 1030, 1035 (11th Cir. 1989). As Judge Edmondson noted in his dissenting opinion in *Greason v. Kemp*, 891 F.2d 829, 842 (11th Cir. 1990),

> [w]hether a healthcare worker's conduct amounts to

---

[22] In *Harris*, the Eleventh Circuit discussed the effect of a denial of a qualified immunity defense at the summary judgment stage on the deliberate indifference inquiry:

> A ruling denying qualified immunity does not render the [defendant] liable for deliberate indifference. It means only that the claims against the [defendant] may proceed to trial. When the qualified immunity entitlement is lost at the summary judgment stage, additional or different facts may be discovered or developed regarding the trial questions of liability and damages. *See* Swint [v. City of Wadley], 5 F.3d [1435,] 1438-39 [(11th Cir. 1993)]. At trial the facts regarding deliberate indifference may be further developed, *e.g.*, Howell v. Burden, 12 F.3d 190, 192 n.2 (11th Cir. 1994), and the jury will determine whether the [defendant] was or was not deliberately indifferent to [plaintiff's] medical needs.

*Harris v. Coweta County*, 21 F.3d 388, 394 (11th Cir. 1994)

20

> deliberate indifference so that the eighth amendment is
> violated is a factually sensitive issue depending on a
> case-by-case analysis: medicine is a delicate blend of
> art and science not easily measured by hard and fast
> rules. Therefore, rarely will a basis exist for an *a
> priori* judgment that a healthcare worker was deliberately
> indifferent and thus violated clearly established rights.

For such reasons, the Eleventh Circuit generally has examined the

acts of healthcare providers in the framework of those standards

designed to assess the efficacy of a qualified immunity defense.

*See e.g.*, *Dolihite v. Maughon*, 74 F.3d 1027 (11th Cir. 1996);

*Howell v. Evans*, 922 F.2d 712 (11th Cir. 1991); *Greason*, 891 F.2d

at 842; *Waldrop*, 871 F.2d at 1050 ("We cannot determine ... whether

[prison doctor's] treatment constituted deliberate indifference to

[inmate's] needs because that treatment must be evaluated according

to professional standards").

Accordingly, this court will reserve examination of the

actions of Dr. David Sandefer until discussion of his qualified

immunity defense. The three-prong deliberate indifference analysis

articulated in *Estelle* will be utilized only to assess the actions

of the prison-officer defendants: Julian Varner, Eleanor Coachman,

and Kimbrell Thomson.

### 1. Did Morrison have a "serious medical need"?

The Supreme Court in *Estelle* did not define the phrase,

"serious medical need." The Eleventh Circuit nevertheless has

interpreted the expression in a manner that embraces psychological

requirements: "Failure to provide basic psychiatric and mental

health care states a claim of deliberate indifference to the

21

serious medical needs of prisoners." *Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir. 1986).

Additionally, the Eleventh Circuit has delineated the following standard as "the appropriate and guiding principle by which to gauge 'serious medical needs' of prisoners": "a 'serious medical need' is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Hill v. Dekalb Regional Youth Detention Center*, 40 F.3d 1176, 1187 (11th Cir. 1994)(quoting *Laaman v. Helgemoe*, 437 F. Supp. 269, 311 (D.N.H. 1977)).

Morrison's death by suicide, in and of itself, strongly suggests that he had a serious mental health need. But that is hindsight. Even so, medical and psychological professionals who evaluated Morrison in the weeks before his death all concluded that he should be monitored, and required further counselling. Thus, this court concludes there is sufficient evidence to support the conclusion that Morrison had serious psychological needs requiring professional intervention. *See Monmouth County Correctional Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987), *cert. denied*, 486 U.S. 1006, 108 S.Ct. 1731, 100 L.Ed.2d 195 (1988).

## 2. **Were defendants aware of Morrison's "serious medical need"?**

The second issue suggested by the Supreme Court's opinion in *Estelle* is, were the prison-official defendants aware of Morrison's

22

serious need for mental health treatment? When addressing such a question, it must be recognized that most occupants of major state and federal penal facilities would profit from some degree of psychiatric or psychological intervention.[23] Prisons, even the best ones, breed despondency.[24] It therefore is not unusual for prisoners to display signs of depression.[25] In tacit recognition of such facts, case law does not require prison officials to safeguard all inmates from suicide. Rather, only those prisoners presenting a "strong likelihood, rather than a mere possibility" of suicide are entitled to protection from self-destruction. *Edwards v. Gilbert*, 867 F.2d 1271, 1276 (11th Cir. 1989)(emphasis supplied)(citations omitted), *modified*, *reh'g denied*, *Edwards v. Okaloosa County*, 23 F.3d 358 (11th Cir. 1994). Egregious circumstances are required before a prison official who fails to identify a potentially suicidal inmate will be held liable under §

---

[23] *See, e.g.*, Stanton E. Samenow, Inside the Criminal Mind 257 (1984):

> We are as we think. It is impossible to help a person give up crime and live responsibly without helping him to change what is most basic—his thinking. Criminals have been rewarded, punished, manipulated, probed for unconscious dynamics, and taught to read, work, and socialize, but they have not been helped to learn brand-new thinking patterns in order to change their way of life.

[24] *See, e.g.*, Karl Menninger, The Crime of Punishment 73 (1966):

> [A prisoner] languishes in the cheerless company of others equally miserable, hopeless, and resentful. He is herded about by men half afraid and half contemptuous of him, toward whom all offenders early learn to present a steadfast attitude of hostility. An atmosphere of monotony, futility, hate, loneliness, and sexual frustration pervades the dank dungeons and cold hangers like a miasma, while time grinds out weary months and years.

[25] *See, e.g.*, James R.P. Ogloff et al., *Mental Health Services in Jails and Prisons: Legal, Clinical, and Policy Issues*, 18 Law & Psychol. Rev. 109, 111 (1994)("the prevalence of mental illness among jail and prison inmates is far greater than that among the general population").

23

1983.[26]

Case law indicates that a "strong likelihood" of suicide does not exist (i.e., that the "awareness" prong of Estelle's deliberate indifference test is not satisfied) unless all of the following factors are present: (1) the inmate previously had threatened or attempted suicide; (2) that prior threat or attempt was known to the defendants; (3) the prior threat or attempt was somewhat recent; and, (4) the prior threat or attempt appeared genuine. See James E. Robertson, Fatal Custody: A Reassessment of Section 1983 Liability for Custodial Suicide, 24 U. Tol. L. Rev. 807, 816-19 (1993). Each facet will be examined below.

### (a) A prior suicide threat or attempt

As the Eleventh Circuit has noted, "[i]n the absence of a previous threat of or an earlier attempt at suicide, we know of no federal court in the nation or any other court within this circuit that has concluded that official conduct in failing to prevent a suicide constitutes deliberate indifference." Edwards, 867 F.2d at 1275 (citations omitted)(footnote omitted). Here, there is no dispute that Morrison slashed his wrist on February 3, 1993.

### (b) Knowledge by the prison officer defendants

Prior to the Supreme Court's decision in Farmer v. Brennan, 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994), the Eleventh Circuit applied an objective standard to determine whether prison officials knew, or should have known, of a particular inmate's

---

[26] See generally, George J. Franks, The Conundrum of Federal Jail Suicide Case Law Under Section 1983 and Its Double Bind for Jail Administrators, 17 Law & Psychol. Rev. 117, 126-29 (1993).

24

suicidal tendencies. *See Popham v. City of Talladega*, 908 F.2d 1561, 1564 (11th Cir. 1990)("[i]n the context of jail suicides, an allegation of deliberate indifference must be considered in light of the level of knowledge possessed by the officials involved, or that which should have been known as to an inmate's suicidal tendencies").

However, the Supreme Court rejected a purely objective test in *Farmer*. Instead, the court held there could be no liability "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, <u>and he must also draw the inference</u>." *Farmer*, 511 U.S. at 837, 114 S.Ct. at 1979 (emphasis supplied). Under the *Farmer* standard, "an official's failure to alleviate a significant risk that he should have perceived but [subjectively] did not [appreciate]" cannot be considered a Constitutional deprivation. *Id.*

Here, it is clear that neither Julian Varner nor Eleanor Coachman knew Morrison had attempted suicide before his arrival at St. Clair Correctional Facility. Accordingly, neither could be characterized as deliberately indifferent to an unknown risk.

Kimbrell Thomson, on the other hand, <u>was</u> aware that Morrison had cut his wrist. Thomson also apparently appreciated that such an act posed a "substantial risk of serious harm," because his knowledge of the incident prompted him to hand-carry Morrison's

25

institutional file to Dr. David Sandefer, to ensure appropriate evaluation of Morrison's mental status.

### (c)  Remoteness

For a prior threat of or attempt at suicide to provide sufficient warning to impute knowledge of a "strong likelihood" of risk to a prison official, the prior threat or attempt must not be temporally remote from the successful custodial act.  For example, in *Kocienski v. City of Bayonne*, 757 F. Supp. 457, 465 (D.N.J. 1991), the court focused on two events that occurred prior to the custodial suicide of a female detainee named Garity.  Approximately two years before Garity's suicide, plaintiff (the sister of the deceased) called the defendant police to report that Garity was missing, and that she had "a history of psychological problems" and "emotional problems."   *Kocienski*, 757 F. Supp. at 460. Approximately 18 months before Garity's suicide, the defendant police were again called, because Garity had overdosed on drugs, and the plaintiff told police that Garity had a "history of depression and suicide."   *Id.*   The court concluded those two incidents "were simply too remote in time and too far divorced from the custodial officials in charge to attribute actual or constructive knowledge of Garity's psychological tendencies."   *Id.* at 465.

Here, Morrison's first suicide attempt occurred on February 3, 1993, while he was in transit from the Franklin County Jail to Kilby Correctional Facility.   He killed himself some two months

26

later, on April 11, 1993.  Accordingly, the two events were not
temporally remote.

### (d)  Genuineness

The prior threat or attempt also must appear to have been
genuine — to have been free of indicia of manipulative sham or
pretense — in order to impart sufficient warning to the prison
officials.  For example, in *Estate of Cartwright v. City of
Concord*, 618 F. Supp. 722 (N.D. Cal. 1985), *aff'd*, 856 F.2d 1437
(9th Cir. 1988), the court determined that a cry of suicide
"overheard by jailers" did not furnish a sufficient basis from
which the inference could be drawn that a substantial risk of
serious harm existed, because the following circumstances attended
the alarm.

> Cartwright [the deceased] and Daniello [another prisoner]
> were in their separate cells.  There was loud and
> boisterous yelling between them, including laughing,
> shouting, joking, and vulgarity.  Daniello faked a
> suicide, and when the jailers responded to it seriously,
> she bragged to Cartwright that she had fooled the
> jailers.  Cartwright and Daniello continued their
> shouting and jocularity, or what the jailers reasonably
> believed was jocularity.

*Estate of Cartwright,* 618 F. Supp. at 728.[27]

Another instructive case is *Bell v. Stigers*, 937 F.2d 1340
(8th Cir. 1991).  In *Bell*, the district court denied summary
judgment for the police officer (Stigers), determining there was a

---

[27] The principle of cases like *Cartwright* is at least as old as Aesop's
*Fables*. Much like the moral of his story of the shepherd's boy who, to assuage
his loneliness, often would cry out, "The Wolf! The Wolf!," to draw husbandmen
from an adjoining field, many learn in the hardest way that "a liar, even though
he occasionally speaks the truth, will not be believed" in time of true peril.
Samuel Croxall & Sir Roger L'Estrange (translators), Aesop's Fables — Lessons
in Living 53-54 (1722).

27

genuine issue of material fact as to whether a statement made by Bell (the deceased) to Stigers constituted a serious threat. Bell said, "[w]ell I think I'll shoot myself" as he and Stigers filled out an arrest report. *Bell,* 937 F.2d at 1341. The Eighth Circuit reversed the district court's denial of summary judgment, saying:

> The [district] court concluded that the jury should decide whether Bell's remark about shooting himself was a sufficiently serious threat to alert Stigers to Bell's suicide risk potential. We disagree. A single off-hand comment about shooting oneself when no gun is available cannot reasonably constitute a serious suicide threat. Bell's remark simply does not rise to a display of suicidal tendencies. Moreover, even if a listener more sensitive than Stigers might have taken the remark seriously, Stigers' failure to interpret it as a genuine manifestation of a suicide threat would at most constitute negligence, not deliberate indifference.

*Id.* at 1344.

The genuineness of Morrison's February 3rd suicide attempt is disputed. Some evidence suggests that his self-inflicted wound may have been an angry (albeit irrational) reaction to mistreatment by his guards. Other evidence supports the view that Morrison genuinely intended to end his life. Given the conflicting tendencies of the evidence, that issue is best resolved by the factfinder.

In summary, the court finds that neither Julian Varner nor Eleanor Coachman possessed knowledge of Morrison's self-inflicted wound; accordingly, neither can be characterized as deliberately indifferent to an unknown risk, and plaintiff's § 1983 claims against those defendants are due to be dismissed. Kimbrell Thomson, on the other hand, was aware of Morrison's potential for

28

suicide, and it also appears that he subjectively appreciated the danger. Therefore, it is necessary to address the last prong of the *Estelle* test as to him.

### 3. Was Thomson "deliberately indifferent" to Morrison's known needs?

Plaintiff must show that Kimbrell Thomson displayed "deliberate indifference" to Morrison's known, serious mental health needs. *Edwards v. Gilbert*, 867 F.2d 1271, 1274-75 (11th Cir. 1989), *modified, reh'g denied, Edwards v. Okaloosa County*, 23 F.3d 358 (1994).

She has not done so, nor can she. Kimbrell Thomson fulfilled his only duty when he promptly referred Morrison to a staff psychologist, after reading the report of Morrison's prior suicide attempt. When Thomson later was alerted to Morrison's fears of sexual assaults by other inmates, he again promptly recommended that Morrison be placed in administrative segregation for protection. Accordingly, this court concludes as a matter of law that the acts of defendant Thomson cannot reasonably be construed as "deliberately indifferent."

### F. Plaintiff's Additional Claims Against Defendants Varner and Coachman

Plaintiff also seeks to hold Varner and Coachman liable for failing to properly train their subordinates in recognizing and classifying inmates with suicidal symptoms. It must be noted at the outset of the discussion which follows, however, that

> [a] supervisory official is not liable under section 1983 for an injury resulting from his failure to train

29

> subordinates unless his "failure to train amounts to
> deliberate indifference to the rights of the persons with
> whom the subordinates come into contact" and the failure
> has actually caused the injury of which the plaintiff
> complains.

*Belcher v. City of Foley*, 30 F.3d 1390, 1397 (11th Cir.
1994)(quoting *Popham*, 908 F.2d at 1564-65)(emphasis supplied).

St. Clair officials provided sufficient access to mental
health treatment.    They scheduled Morrison for numerous
appointments with psychiatrists, psychologists, and counselors.
During the last weeks of his life, Morrison met seven times with
mental health professionals.[28]  To the extent that Morrison's plea
for protection from inmates who threatened harm if he did not
submit to deviant sexual acts can be viewed as a request for mental
health services, that request also was honored swiftly.  St. Clair
classification specialists were required to follow all policies
implemented by the Department of Corrections.  Security officers
were trained to detect potentially suicidal inmates through in-
house training sessions.  Morrison was classified and housed in
accordance with his known medical conditions, his ability to get
along with other inmates, and the escape-risk potential attributed
to him.  The evidence simply does not support the conclusion that
any of the prison-official defendants or their subordinates were
deliberately indifferent to Morrison's rights or needs.

Plaintiff also asserts the prison's health and medical
screening policies were grossly inadequate.  Such arguments have

---

[28] Once with David Sandefer, four times with Todd Walborn, M.D., and twice
with Dr. Blankenship.

30

been rejected by the Eleventh Circuit. *See Edwards v. Gilbert*, 867 F.2d 1271, 1276 (11th Cir. 1989)(citing *Roberts v. City of Troy*, 773 F.2d 720 723, 725 (6th Cir. 1985)(holding plaintiff's argument that proper screening would have shown decedent fit profile of high suicide risk insufficient to establish deliberate indifference under any definition)); *see also Schmelz v. Monroe County*, 954 F.2d 1540, 1544 (11th Cir. 1992)(sheriff granted qualified immunity although he had no written suicide policy and only "made an effort to identify and protect potentially suicidal inmates from self-harm").

Plaintiff finally points to weaknesses in the prison's training of personnel in the classification of inmates. The Eleventh Circuit recognizes, however, that such weaknesses, even if known by prison officials, do not place officials "on notice that at the time of [plaintiff's] death the status of the [training of classification personnel] would violate [plaintiff's] constitutional rights." *Clark v. Evans*, 840 F.2d 876, 883 (11th Cir. 1988). Moreover, there is no evidence to support the conclusion that additional training would have yielded a different outcome in this case. The defendants' actions in March and April of 1993 — referring Morrison for psychiatric treatment and segregating him from the general population — were entirely reasonable.

This court concludes that there is no evidence tending to prove that Varner, Coachman, or Thomson were deliberately

31

indifferent to Morrison's serious mental health needs, or that any deliberately indifferent training or policy caused his death. This court therefore finds that those defendants did not act with deliberate indifference to Morrison's mental health or medical needs. "A prison custodian is not the guarantor of a prisoner's safety." *Popham v. City of Talladega*, 908 F.2d 1561, 1564 (11th Cir. 1990)(citing *Freedman v. City of Allentown*, 853 F.2d 1111, 1115 (3d Cir. 1988)). Accordingly, Morrison's § 1983 claims against Varner, Coachman, and Thomson are due to be dismissed.[29]

The court now turns to a consideration of her claim against Dr. David Sandefer and his qualified immunity defense.

## G. Qualified Immunity

Qualified immunity insulates governmental officials in their individual capacities from civil lawsuits, so long as the challenged discretionary conduct does not violate clearly established federal statutory or constitutional rights. *See Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Adams v. Poag*, 61 F.3d 1537 (11th Cir.), *reh'g denied*, 70 F.3d 1287 (11th Cir. 1995).

In *Harlow*, the Supreme Court established an objective standard to make summary judgment an appropriate device to "avoid excessive disruption of government and permit the resolution of many

---

[29] Given the court's finding that Varner, Coachman, and Thomson were not deliberately indifferent to Morrison's serious medical needs, the court need not address the element of causation, nor the defense of qualified immunity for those defendants. In any event, those defendants would be entitled to qualified immunity because their conduct, which did not violate Morrison's constitutional rights, cannot be said to have violated clearly established law.

32

insubstantial claims...." *Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738. The Court held that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id*.

Qualified immunity is intended to give officials the ability to anticipate when their conduct may give rise to liability for damages. *See Anderson v. Creighton*, 483 U.S. 635, 645, 107 S.Ct. 3034, 3042 (1987)("Where [the qualified immunity] rule is applicable, officials can know that they will not be held personally liable as long as their actions are reasonable in light of current American law").

The burden placed on a plaintiff opposing a qualified immunity defense is onerous.

> A plaintiff must establish more than broad legal truisms; he or she must demonstrate that the law fixed the contours of the right so clearly that a reasonable official would have understood his acts were unlawful. ... Thus, "pre-existing law must dictate, that is truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law in the circumstances." Moreover officials need not "'be creative or imaginative in drawing analogies from previously decided cases.'"

*Dolihite v. Maughon*, 74 F.3d 1027, 1040-41 (11th Cir.), *cert. denied*, __ U.S. __, 117 S.Ct. 185 (1996)(citations omitted).

The Eleventh Circuit has framed the qualified immunity standard as follows:

33

> Once a defendant advances a defense of qualified immunity, he is entitled to summary judgment unless the legal norms allegedly violated by the defendant were clearly established at the time of the challenged actions....    The words 'clearly established ... constitutional rights' may not be used to read the defense of immunity out of federal tort law by the facile expedient of stating constitutional rights in the most general possible terms....    The Supreme Court has stressed that the right the official is alleged to have violated must have been clearly established in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.

> An official will be immune if the law with respect to [his] actions was unclear at the time the cause of action arose" or if a reasonable officer could have believed ... [his actions] to be lawful, in light of clearly established law and the information ... [the officer] possessed. For purposes of qualified immunity, an abstract mandate to act with care or reasonably is too vague; generalities are just not helpful. In sum, the qualified immunity defense ... provides ample protection to all but the plainly incompetent or those who knowingly violate the law.

*Edwards v. Gilbert*, 867 F.2d 1271, 1273 (11th Cir. 1989)(citations and internal quotation marks omitted); *see also Clark v. Evans*, 840 F.2d at 881, 882 (proper inquiry is "fact-specific"; officer who shot and killed fleeing prisoner immune because "[n]o case ha[d] expressly held that an officer has to first shoot to maim before shooting to kill").

The Eleventh Circuit defines the district court's inquiry on a motion for summary judgment asserting qualified immunity as follows: "the relevant question on a motion for summary judgment based on a defense of qualified immunity is whether a reasonable official could have believed his or her actions were lawful in light of clearly established law and the information possessed by

34

the official at the time the conduct occurred." *Stewart v. Baldwin County Board of Education*, 908 F.2d 1499, 1503 (11th Cir. 1990).[30]

Thus, this court must determine whether the law, at the time of Dr. David Sandefer's actions, clearly established the conclusion that a reasonable clinical psychologist on the staff of a state prison, knowing what Dr. Sandefer knew, would have realized that his conduct violated Morrison's constitutional rights.

In order for Dr. Sandefer to be stripped of qualified immunity, plaintiff must demonstrate his treatment violated a clear and specific standard, so that similarly situated mental health care providers would have known his or her actions violated Morrison's constitutional rights.[31]

> In a medical treatment case, a plaintiff may demonstrate the existence of a clearly established medical standard either through reference to prior court decisions or to the contemporary standards and opinions of the medical profession.   Plaintiffs   frequently   resort   to   the

---

[30] The Supreme Court also has elaborated on the district court's role at the summary judgment stage:

> On summary judgment, the judge appropriately may determine, not only the currently applicable law, but whether that law was clearly established at the time an action occurred. If the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to "know" that the law forbade conduct not previously identified as unlawful.

*Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)(footnote omitted).

[31] The Eleventh Circuit states that the issue to be resolved in determining whether a medical defendant is entitled to qualified immunity is

> whether a reasonable doctor in the same circumstances and possessing the same knowledge as [the medical defendant] could have concluded that his actions were lawful, i.e., not deliberately indifferent to [the deceased's] psychiatric needs.

*Waldrop v. Evans*, 871 F.2d 1030, 1034 (11th Cir.), *reh'g denied*, 880 F.2d 421 (1989)(citing *Clark v. Evans*, 840 F.2d 876, 880 (11th Cir. 1988); *Anderson v. Creighton*, 483 U.S. 635, 641, 107 S.Ct. 3034, 3040 (1987)).

35

contemporary standards of the medical profession when the challenged action required the exercise of medical judgment. In such an instance, a plaintiff may produce opinions of medical experts asserting that the inmate's treatment was so grossly contrary to accepted medical practices as to amount to deliberate indifference.

*Adams*, 61 F.3d at 1543 (citations omitted).

Plaintiff presents expert testimony through the affidavit of Raymond O. Sumrall, Ph.D., a licensed social worker who purports to have expertise in criminal justice and inmate classification. The Eleventh Circuit has indicated that experts can aid the court in determining the validity of a qualified immunity defense when the plaintiff's allegations hinge upon the appropriateness of the actions of medical or mental health professionals.

Such expert medical testimony, making reference to specific deficiencies in a defendant's treatment and specific medically accepted standards might, in conjunction with the specific facts of a case, persuade a court that the medical defendant's actions in the case were clearly as great a departure from appropriate medical standards as previous departures found unconstitutional in prior cases -- i.e., might persuade a court that a reasonable professional in defendant's shoes would have known that his challenged actions (or inaction) violated plaintiff's constitutional rights.

*Dolihite*, 74 F.3d at 1046.

However, an expert opinion which merely expresses conclusory opinions, even if couched in the language of the relevant legal standard, will be of little assistance to the court. *See Rogers v. Evans*, 792 F.2d 1052, 1062 n.9 (11th Cir. 1986)(approving the striking of medical expert's affidavit that was "phrased in conclusory terms without citing facts" after concluding the affidavit was "defective to create a factual dispute").

36

The expert affidavit presented by plaintiff herein provides little assistance in determining whether Dr. Sandefer is entitled to qualified immunity. The court notes that Raymond O. Sumrall is a licensed social worker, not a clinical psychologist, and the court therefore is not convinced that he is qualified to address the standard of care by which Dr. Sandefer was bound.

Moreover, an assertion of negligence will not strip a defendant of his qualified immunity defense. *See Howell v. Evans,* 922 F.2d 712, 722 n.10 (11th Cir. 1991)("When the [expert's] affidavit ... employs the established terminology of negligence and presents no factual allegations which a reasonable fact-finder could credit as deliberate indifference, the affidavit cannot alone establish a violation of a clear medical standard which can defeat qualified immunity").

Obviously, it can be persuasively argued that Dr. Sandefer's assessment of Morrison's mental status, and thus, his risk of suicide, was incorrect. Viewed through the clear lens of hindsight, Sandefer's clinical impressions may have been faulty. Nevertheless, that does not necessarily mean either that Dr. Sandefer's conduct constituted psychological malpractice, or that it rose to the level of a constitutional violation. *Estate of Cole,* 94 F.3d 254, 261 (7th Cir. 1996)("Mere differences of opinion among medical personnel regarding a patient's appropriate treatment do not give rise to deliberate indifference").

Indeed, Eleventh Circuit cases that have denied mental health

37

therapists the defense of qualified immunity have presented
particularly egregious circumstances.[32]  For example, in *Dolihite
v. Maughon*,[33] the Eleventh Circuit did not allow a primary therapist
for a juvenile who had been admitted to a state adolescent hospital
to prevail on her qualified immunity defense, where the plaintiffs

> produced evidence from which a fact finder could conclude
> that [the therapist] knew that [the juvenile] attempted
> to hang himself on March 22 but that she nevertheless
> took him off of close observation status without taking
> any other measures to protect his safety or otherwise
> meet his mental needs.

*Dolihite v. Maughon*, 74 F.3d 1027, 1041 (11th Cir.), *cert. denied*,
__ U.S. __, 117 S.Ct. 185 (1996).  Only two days after that suicide
attempt, the juvenile was taken off close observation status; less
than one hour later, the juvenile was found hanging in his
dormitory room closet by a shoestring.

In *Greason v. Kemp*, 891 F.2d 829 (11th Cir. 1990), a mental
health team leader at a state mental health center was denied
qualified immunity.  Defendant knew that the inmate "had been
experiencing feelings of despair and thoughts of suicide, and on
one occasion had attempted suicide by tying something around his

---

[32] "The refusal to provide proper treatment must not simply be a medical
choice but a gross violation of accepted practice.  When the Supreme Court set
up this standard in Estelle [v. Gamble, 429 U.S. 97, 105 n.10, 97 S.Ct. 285, 291
n.10 (1976)], it referred to two cases of grossly inadequate treatment: one where
the doctor injected penicillin into a patient he knew to be allergic, the other
where the doctor threw away a salvageable ear and stitched the stump."  *Howell
v. Evans*, 922 F.2d 712, 721 n.9 (11th Cir. 1991).

[33] *Dolihite* had not been authored at the time of Morrison's death and,
therefore, its holding does not help in determining what the "clearly established
law" was at the time of Morrison's death.  However, when the actions of Dr.
Sandefer in this case are compared to those of the defendants in *Dolihite*, and
to actions of similar defendants in prior Eleventh Circuit cases contrasted to
the actors in *Dolihite*, it compels the conclusion that Dr. Sandefer did not
violate clearly established law.

throat." *Greason,* 891 F.2d at 832.  The suicide incident had been reported to the health team leader, not only by two inmates, but also by Greason's parents.  *Id.*  Yet, the therapist did nothing: he neither notified the staff psychiatrist nor put Greason on suicide watch.  Greason hung himself only 21 days after his parents talked with the team leader.

Dr. Sandefer's actions are easily distinguished from the actions of the therapists in *Dolihite* and *Greason,* because Dr. Sandefer fully apprised treating professionals of Morrison's past history of two suicide attempts when referring him for treatment — even though, based on his evaluation of Morrison, Dr. Sandefer personally concluded that Morrison was not suicidal.

It is significant to note that Dr. Sandefer is not a psychiatrist.  He did, however, refer Morrison to a psychiatrist, Dr. Todd Walborn, for further evaluation.  Dr. Walborn independently reached the same conclusion as Dr. Sandefer: Morrison then was not suicidal.

Thus, this court concludes that a reasonable clinical psychologist, placed in Dr. Sandefer's situation, would have believed his actions in referring Morrison for counseling and treatment and relaying all relevant, available information regarding Morrison's condition, to be lawful in light of clearly established law.

A detailed comparison of Dr. Sandefer's actions to those of Dr. Chester Jenkins in *Dolihite* is instructive.  *See Dolihite,* 74

39

F.3d at 1047-49. In *Dolihite*, the Eleventh Circuit compared the
actions of Dr. Jenkins to those of the doctors in the prior
Eleventh Circuit opinions of *Greason*, 891 F.2d 829, *Rogers*, 792
F.2d 1052, and *Waldrop*, 871 F.2d 1030, and concluded that
"[p]laintiffs have not adduced facts to demonstrate that Dr.
Jenkins' alleged departure from professional judgment was
comparable to that previously found to constitute a violation of
constitutional rights." *Dolihite*, 74 F.3d at 1048.[34]   The
plaintiffs in *Dolihite* asserted that

> Dr. Jenkins failed to recognize David's [the juvenile's]
> obvious signs of clinical depression and bipolar disorder
> and to diagnose him accordingly.   They contend that
> David's history of suicide threats and his family history
> of suicide, his increasing episodes of self-mutilation
> and mood swings should have led to that diagnosis.   They
> assert that Dr. Jenkins should have prescribed intense
> and lengthy one-on-one therapy and antidepressant
> medication for David and that the failure to do so was a
> total departure from professional judgment.

*Id.* at 1046.   The court noted that Dr. Jenkins knew the following
information when he allegedly failed to recognize David's suicidal
potential.

---

[34]   In analyzing the actions of ·Dr. Jenkins, the Eleventh Circuit undertook

a fact-sensitive examination of controlling case law, particularly
Greason v. Kemp, 891 F.2d 829 (11th Cir. 1990).   We must then
compare the facts in such case law (which have been determined to be
in violation of the Constitution) with the precise actions and the
precise knowledge of the actors in this case.   For example,
appellant Dr. Jenkins in the instant case is comparable to the
psychiatrist in Greason. Dr. Jenkins' actions, and his knowledge at
the time, must be identified precisely and then compared to the
actions and knowledge of the psychiatrist in Greason.   Only if the
actions of Dr. Jenkins, in light of his knowledge, are materially
similar to the actions and knowledge of the psychiatrist in Greason
can it be said that he could not have thought his actions were
lawful.

*Dolihite*, 74 F.3d at 1035 n.2.

40

1.   David's previous suicidal threats and gestures;

2.   David's grandmother's suicide;

3.   Dr. Maughon's initial diagnosis of David, "conduct disorder, solitary aggressive type";

4.   David's January 26, 1992 deep, possibly self-inflicted puncture wound to his left wrist and statement that he was going to "cut his arm off and kill himself";

5.   A February, 2, 1992 incident when David wrote, "Oh, God I want to die, please take me or I'll commit suicide, Death, Suicide are the facts of life" on the security screen in his dormitory room.

6.   A February 4, 1992 self-inflicted injury to the left wrist and Progress Note of the same date indicating that David had been presenting as irrational;

7.   A February 18, 1992 incident when David was talking to himself and telling a staff nurse that he was talking "to a friend who told him what to do";

8.   A February 24, 1992 incident when David performed some allegedly Satanic ritual in his room, inflicted further injury to his left wrist, after which he told a mental health worker that the devil told him not to speak;

9.   A March 8, 1992 incident when David cut his arm with a piece of metal in an apparently suicidal gesture, and after which he pulled out the stitches and refused new stitches;

10.   A March 15, 1992 incident when David bled on the walls and defecated on the floor of the time out room; and,

11.   A March 18, 1992 incident when David re-injured his left wrist by sticking a pencil in it and was again sent to the emergency room.

*Id.* at 1048.  Even given Dr. Jenkins' knowledge of the foregoing

facts, the Eleventh Circuit nevertheless concluded that his mis-

diagnosis did not rise to the level of a constitutional violation.

This court concludes that the actions of Dr. Sandefer were not

41

even remotely comparable to those of Dr. Jenkins in *Dolihite*. Moreover, Dr. Sandefer was not faced with circumstances similar to Dr. Jenkins. For example, David attempted suicide at least six times; Morrison attempted suicide twice, at most.[35] David acted irrationally and discussed suicidal thoughts; Morrison denied such thoughts, and appeared to act rationally throughout his incarceration. Yet, even if this court found that Dr. Sandefer possibly should have investigated Morrison's situation more thoroughly, communicated better, or spent greater time evaluating Morrison, this court is of the opinion that such inaction would constitute negligence, at most. In any event, such inaction does not constitute deliberate indifference, because prior case law has not clearly delineated such conduct as unconstitutional. *See Lassiter v. Alabama A & M, Board of Trustees*, 28 F.3d 1146, 1150 (11th Cir. 1994)("If case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant")(citations omitted).

Because a comparison of the facts of this case to the actions of mental health defendants as related in pre-existing case law does not "truly compel" a finding that Dr. Sandefer violated Morrison's constitutional rights, he will not be stripped of his qualified immunity defense. "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Maciariello v. City of Lancaster*, 973 F.2d 295, 298 (4th Cir. 1992), *cert. denied*, 506 U.S. 1080, 113 S.Ct. 1048 (1993).

---

[35] See note 8 *supra*.

42

### III.  PLAINTIFF'S STATE LAW CLAIM

Plaintiff also alleges a state law claim for wrongful death. Federal jurisdiction over pendent state law claims is governed by 28 U.S.C. § 1367(a), which provides that

in any civil action in which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

However, "the district court may decline to exercise supplemental jurisdiction over a claim under subsection (a) if ... the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). This court shall dismiss all of the federal claims that gave it original jurisdiction, and declines to exercise supplemental jurisdiction over plaintiff's state law claim.

### IV.  DR. SANDEFER'S MOTION TO COMPEL

Dr. Sandefer's pending motion to compel is more appropriately addressed by the Circuit Court of Montgomery County, Alabama, following remand. Accordingly, the court declines to address the merits of that motion.

### V.  CONCLUSION

An order consistent with this memorandum opinion shall be entered contemporaneously herewith.

DONE this **20**th day of March, 1998.

United States District Judge

43